## AFFIDAVIT IN SUPPORT OF AN
## APPLICATION FOR SEARCH WARRANT

I, Jeff G. Thomson, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.       I make this affidavit in support of an application for a search warrant for information associated with electronic ("e-mail") account crsargent1989@yahoo.com (the "TARGET ACCOUNT"), which is stored at premises controlled by Yahoo, Inc. ("Yahoo"), an e-mail provider headquartered at 1199 Coleman Avenue, San Jose, California, 95110.   The information to be searched is described in the following paragraphs and in Attachment A.   This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A) to require Yahoo to disclose to the government copies of the information (including the content of communications) further described in Section I of Attachment B.   Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.   As set forth herein, there is probable cause to believe that the TARGET ACCOUNT was used in furtherance of a scheme to commit wire fraud and bank fraud in connection with the purchase and/or refinancing of multiple commercial real estate properties.

2.       I am a Special Agent with the Federal Deposit Insurance Corporation, Office of Inspector General, New York Field Office, where I have been employed since May 2020.   My current duties include the investigation of financial crimes including wire and bank fraud, money laundering, and identity fraud, as well as other financial crimes.   From July 2007 to May 2020, I was employed as a Special Agent with Immigration and Customs Enforcement, Homeland Security Investigations in the Newark, New Jersey field office.   Throughout the course of my

career, I have conducted and assisted in hundreds of investigations involving money laundering and bank fraud schemes, and many other illegal schemes impacting individuals, partnerships, corporations, and financial institutions.  I have extensive experience conducting search, seizure, and arrest warrant operations.  I am authorized to investigate violations of the laws of the United States, and I am a law enforcement officer with the authority to execute warrants issued under the authority of the United States.

3.      The facts set forth in this affidavit are based on my own personal knowledge; knowledge obtained from other individuals during my participation in this investigation, including other law enforcement officers; my review of documents, computer records, and other information related to this investigation; communications with others who have personal knowledge of the events and circumstances described herein; and information gained through my training and experience.  Because this affidavit is submitted for the limited purpose of establishing probable cause in support of the application for a search warrant, it does not set forth each and every fact that I or others have learned during the course of this investigation.

4.      Based on my training and experience; documents and information obtained from victim banks and other persons and entities during the course of this investigation; and the facts as set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. § 1343 (Wire Fraud), 18 U.S.C. § 1344 (Bank Fraud), and 18 U.S.C. § 1014 (False Statements to a Financial Institution), among others, have been committed by an individual who used and had control over the TARGET ACCOUNT. There is also probable cause to search the information described in Attachment A for evidence and fruits of these crimes, further described in Attachment B.

## JURISDICTION

5.      This Court has jurisdiction to issue the proposed Order because it is "a court of competent jurisdiction," as defined in 18 U.S.C. § 2711. *See* 18 U.S.C. § 2703(d). Specifically, the Court is a district court of the United States that has jurisdiction over the offense being investigated. *See* 18 U.S.C. § 2711(3)(A)(i). As discussed more fully below, acts or omissions in furtherance of the offenses under investigation occurred in the District of New Hampshire. *See* 18 U.S.C. § 3237. Specifically, this investigation involves a scheme to defraud lenders and federally-insured financial institutions within the District of New Hampshire.

## PROBABLE CAUSE

6.      As set forth below, there is probable cause to believe that the contents of the TARGET ACCOUNT contains evidence of violations of 18 U.S.C. § 1343 (Wire Fraud), 18 U.S.C. § 1344 (Bank Fraud) and 18 U.S.C. § 1014 (False Statements to a Financial Institution) Specifically, as set forth below, there is probable cause to believe that the TARGET ACCOUNT was used to make false statements and transmit fabricated documents to lenders in connection with the purchase, and/or financing and/or refinancing of commercial properties and real estate within the District of New Hampshire.

*Relevant Parties/Overview*

7.      Charles Sargent, Jr (Sargent) was a resident of New Hampshire engaged in the purchase and ownership of real property within the District of New Hampshire.

8.      Kenneth Brochu was a resident of New Hampshire employed by Sargent to do maintenance work on properties owned by Sargent.

9.      Valerie Brochu was a resident of New Hampshire employed by Sargent as a bookkeeper.

10.     John Allen was an attorney engaged in private practice within New Hampshire, including the representation of Sargent in connection with real estate transactions.

11.     Grand Coast Capital (Grand Coast), was a private lending and investment firm that provides financing solutions to local real estate investors, operators and developers across the United States. Grand Coast maintained an office in Quincy, Massachusetts.

12.     Optima Bank & Trust (Optima) was a federally-insured financial institution based in Portsmouth, New Hampshire.

13.     Cambridge Trust was a federally-insured financial institution based in Cambridge, Massachusetts. Cambridge Trust acquired Optima in approximately 2019.

14.     Sargent has been in contact with Grand Coast regarding loan applications via email using the TARGET ACCOUNT since at least November 1, 2017. Sargent purchased a hotel in Laconia, New Hampshire with financing from Grand Coast on or about November 3, 2017.

15.     This investigation has discovered evidence that, during approximately 2018 and 2019, Sargent and others engaged in a scheme to defraud Grand Coast, Optima and successor in interest Cambridge Trust by making material misrepresentations in connection with his financing and acquisition of multiple real estate properties located in New Hampshire. These misrepresentations included concealment of the true purchase price of the property by using a straw purchaser and/or middleman, falsification of his bank account balance, and providing fabricated leases meant to make the property appear more profitable and thus a better investment for a mortgage lender.

*1037-1045 Elm Street*

16.     1037-1045 Elm Street, Manchester, New Hampshire (ELM) was a commercial property with approximately six levels located in downtown Manchester. ELM's occupants were a first-floor restaurant (Margarita's) and office tenants in the upstairs office suites.

17.     Your affiant has reviewed a Small Balance Commercial Loan Application completed by Sargent on February 14, 2018, and submitted to Grand Coast seeking a $3,525,000 to purchase ELM. In this document, Sargent stated that he was the President of Excalibur Management Services, Inc, and that he had $1,547,000 in cash on hand and in banks. Your affiant has reviewed a Purchase and Sales Agreement (P&S) provided to Grand Coast by Sargent showing his agreement to purchase ELM from Mohammed Mobeen (Mobeen) for $4.7 million.

18.     Your affiant has reviewed an email exchange from February 2018 between Sargent and Grand Coast Vice President of Acquisitions Matthew DiVito using the TARGET ACCOUNT, in which a term sheet for a $3,500,000 loan is discussed.

19.     Your affiant has reviewed documents received from Yahoo showing that "Charles Sargent" is the name associated with the TARGET ACCOUNT.

20.     Your affiant has reviewed an April 6, 2018 email from Allen to Grand Coast employees with carbon copy to Sargent at the TARGET ACCOUNT with subject line "Closing for Elm Street." In this email, Allen requested that the closing be scheduled for a Monday afternoon.

21.     Your affiant has reviewed public records showing that Chase Block LLC sold ELM to Chase Block Realty Associates LLC on April 9, 2018, for $2.7 million. Your affiant has reviewed public records showing Chase Block LLC was managed by Dick Anagnost (Anagnost), and that Chase Block Realty Associates was managed by Kenneth Brochu.

22.     Your affiant has reviewed public records showing that, on the same date (April 9, 2018), Chase Block Realty Associates LLC sold ELM to 1037-1045 Elm Street LLC for $4.7 million. Your affiant has reviewed public records showing that 1037-1045 Elm Street LLC was managed by Sargent.

23.     Your affiant has reviewed a HUD-1 Uniform Settlement Statement (HUD-1) provided by Grand Coast related to the ELM transaction. This document is signed by Kenneth Brochu on behalf of Chase Block Realty Associates LLC as "Seller." Your affiant is aware that the HUD-1 is a document that lists all charges and credits to the buyer and to the seller in a real estate settlement, or all the charges in a mortgage refinance. This document shows the following:

- Contract sales price - $4,700,000

- Deposit/earnest money paid by the buyer - $200,000. Your affiant has reviewed a copy of a $200,000 check drawn on Citizens Bank account # ▮▮▮▮1289 at Citizens Bank held by Excalibur Management Services, Inc made payable to Mobeen. Your affiant has reviewed records for this account provided by Citizens Bank and said records do not reflect this check ever being cashed or deposited.

- Principal amount of new loan - $3,500,000

- Cash from borrower - $1,153,914

24.     In an interview with law enforcement agents assigned to this investigation, Anagnost stated that he sold ELM to Mobeen in April 2018 for $2.7 million. Anagnost stated that Mobeen informed him that he had a buyer willing to pay $200,000 more for ELM than the price he was paying Anagnost. Anagnost stated that, approximately a month later, he learned that ELM sold again for almost double the price. Anagost stated that he did not know how this was possible. Anagnost stated that he did not know Sargent was involved with ELM until approximately a month

after he sold it to Mobeen, when he met Sargent in person. Anagnost stated that Sargent informed him that his (Sargent's) way of doing business was to get appraisals to come in above value so he could get more loan money.

25.     In an interview with law enforcement agents assigned to this investigation, Kenneth Brochu stated that he has done handyman work for Sargent in the past and has known Sargent since approximately 2014. Brochu stated that Sargent has asked Brochu to sign documents for him in the past related to property purchases. Brochu stated that he did not receive any payment for signing these documents for Sargent. Brochu stated that he never purchased or owned ELM.

26.     Your affiant has reviewed records for Interest on Lawyers' Trust Account (IOLTA) account #█████4834 (the 4834 account) and IOLTA account #█████0196 (the 0196 account) held by NBT Bank in the names of John L. Allen PC and Allen-Fuller PA respectively. On April 9, 2018, the 0196 account received a wire transfer from Grand Coast in the amount of $3,412,500, representing the loan proceeds for the ELM transaction. On April 10, 2018, $3,412,500 was transferred to the 4834 account. On April 10, 2018, $289,399.30 was transferred to Excalibur Management, and a $450,000 check was issued payable to Mobeen. These transactions do not appear on the HUD-1 for this transaction provided by Grand Coast and appear to have been funded by the loan proceeds. Additionally, there is no indication of any funding contributed by the Buyer to the transaction as purported in the HUD-1, as it appears the entire transaction (including fees, taxes, mortgage payoff and funds to seller) was funded by the Grand Coast loan.

27.     Your affiant has reviewed an email sent from Sargent to DiVito on March 22, 2018 with documents attached. Your affiant has reviewed these documents, which are purported to be leases for tenants in ELM. These documents include a purported lease agreement between the City of Manchester and Radio 95.5 for suite 204 in ELM, dated October 23, 2017. This document bears

a signature on behalf of the City of Manchester purported to be Anagnost's. Your affiant has conducted online research, including the website for the Federal Communications Commission, and has been unable to locate any evidence that there was ever a radio station in New Hampshire on frequency 95.5. At the bottom of this email is another email dated March 12, 2018, from the TARGET ACCOUNT to appraiser@targetappraisals, which appears to be the same email sent to DiVito described above.

28.     Your affiant has also reviewed a document provided by to Grand Coast by Sargent purporting to be a lease agreement between the City of Manchester and Manchester School District SAU 37, for the benefit of Manchester Community Television (MCTV), dated January 5, 2015, to extend a lease for suites 300 and 402 at a rent of $7,841.25 per month.

29.     In an interview with law enforcement agents assigned to this investigation, Anagnost stated that there were four tenants in ELM when he sold it to Mobeen, including Margarita's, MCTV, City of Manchester Contributory Retirement System (City Retirement), and Harbor One Mortgage, formerly known as Merrimack (Harbor One). Anagnost stated that Harbor One was the largest tenant and had informed him that they planned to move, which was one of the reasons he wanted to sell ELM. Anagnost reviewed the purported lease for 95.5 (above) and stated that he did not execute any leases during 2017 and that it was not his signature. Anagnost also stated that the address listed for Anagnost's company on the purported lease was incorrect. Anagnost stated that MCTV had an affiliated radio station, but it was the same entity as MCTV and was covered under a single lease. Anagnost also reviewed the purported lease extension for MCTV (above) and stated that it was not authentic. Anagnost also stated that he provided a Proration Agreement to Mobeen when he sold ELM to him, which showed that the MCTV rent

was $4,155.98, not $7,841.25, and that therefore this purported lease extension for MCTV is fraudulent.

30.     Your affiant has reviewed a document provided to Grand Coast by Sargent purporting to be a February 2018 bank statement for account # ████ 1289 at Citizens Bank held by Excalibur Management Services, Inc. showing a balance of $1,462,709.78. Your affiant has received the February 2018 statement for this account from Citizens Bank, which shows a balance of $21,261.99.

31.     In an interview with law enforcement agents assigned to this investigation, Adam Johnston stated that he was a Commercial Loan Officer for Optima and later Cambridge Trust. Johnston stated that Optima officially merged with Cambridge Trust on April 18, 2019. Johnston stated that he met with Sargent in February 2018 to discuss refinancing ELM post-acquisition. Johnston stated that leases in place for ELM were very important to the approval of the loan, and that ELM was about 100% leased out at time of the deal. Johnston stated that Sargent provided leases for Margarita's, City Retirement, MCTV and a radio station. Johnston stated that Optima eventually agreed to refinance ELM. Johnston stated that the ELM loan became delinquent in October 2018. Johnston stated that he and other Optima employees met with Sargent in February or March 2019 to discuss the delinquency. Johnston stated that Sargent provided copies of letters directed to Margarita's and Harbor One that instructed them to pay rent directly to Optima. Johnston stated that Sargent said that he did not direct the other ELM tenants (City Retirement, radio station and MCTV) to pay their rent to Optima, because he was in negotiations with these tenants. Johnston stated that Sargent became completely delinquent on the ELM loan in approximately June 2019, and that Sargent discontinued any payments to Cambridge Trust. Johnston stated that Cambridge Trust then exercised its right to assignment of leases and rents,

and hired Colliers International (Colliers) to manage ELM on its behalf. Johnston stated that Colliers discovered that MCTV and the radio station were not individual lessees, as Sargent had represented when securing the loan from Optima. Johnston stated that Sargent had shown him the spaces in ELM occupied by MCTV and the radio station and represented to him that each tenant was on a separate lease. Johnston stated that he had pre-closing conversations with Sargent wherein Sargent overstated ELM's annual rental income by $100,000. Johnston stated that Cambridge Trust conducted a post-loan default due diligence investigation for the ELM transaction and discovered that ELM was sold for $2,700,000 the day before Sargent acquired it for $4,700,000. Johnston stated that, at the time Sargent acquired ELM, he paid off a mortgage loan to Anagnost, the former owner of the building. Johnston stated that Sargent never informed Optima of the first transfer of the property for $2,700,000, and if he had, Optima would never have given Sargent a loan for $3,825,000.

32.     Your affiant has reviewed a July 25, 2018 email from Johnston to the TARGET ACCOUNT with subject line "1037-1045 Elm Street Appraisal." Attached is an appraisal for ELM prepared by The Stanhope Group. A "Rent Roll" section is included within this document, which lists "Radio 95.5" and MCTV as separate tenants, paying $4,669 and $7,841 in monthly rent respectively.

*AUTUMN FROST VACANT LAND*

33.     The Autumn Frost Subdivision (AUTUMN FROST) was a tract of vacant land in Hookset, New Hampshire.

34.     In an interview with law enforcement agents assigned to this investigation, DiVito stated that Grand Coast loaned Sargent $1.3 million to acquire AUTUMN FROST. DiVito stated that, when Sargent started getting behind on the payments for this loan, he contacted Hookset town

officials regarding the permit that Sargent had provided to Grand Coast for AUTUMN FROST. DiVito stated that the town officials informed him that the permit provided by Sargent was not valid, and that DiVito should speak to David Scarpetti, the former owner of AUTUMN FROST. DiVito stated that he then realized that there had been two transfers of AUTUMN FROST on the date that Grand Coast made the loan to Sargent. DiVito said that Scarpetti told him that he had sold AUTUMN FROST to Sargent.

35.     Your affiant has reviewed a June 11, 2018 email from Target Appraisal Services to the TARGET ACCOUNT with subject line "Fwd: Autumn Frost Subdivision FINAL.pdf." Attached to this email is an appraisal prepared by Wells Appraisal Service for Grand Coast on AUTUMN FROST. Attached to this appraisal is a P&S showing that Sunburst Lane Realty Company LLC agreed to sell AUTUMN FROST to Sargent for $1,300,000.

36.     Your affiant has reviewed public records showing that Alana Demers deeded AUTUMN FROST to Autumn Frost Realty Associates LLC on June 18, 2018. Your affiant has reviewed public records showing Autumn Frost Realty Associates LLC was managed by Kenneth Brochu. Your affiant has reviewed public records showing that Autumn Frost Realty Associates LLC deeded AUTUMN FROST to Sunburst Lane Realty Company LLC on June 18, 2018. Your affiant has reviewed public records showing that Sunburst Lane Realty Company LLC is managed by Sargent.

37.     Your affiant has reviewed a P&S provided by Grand Coast showing that Sunburst Lane Realty Company LLC agreed to sell AUTUMN FROST to Sargent for $1,300,000 on April 28, 2018. The P&S is signed by Kenneth Brochu as "Seller."

38.     Your affiant has reviewed records showing that Grand Coast filed a mortgage on AUTUMN FROST on June 18, 2018 for $1,500,000.

39.     Your affiant has reviewed a June 13, 2018 email sent by Allen to Grand Coast employees with carbon copy to Sargent at the TARGET ACCOUNT with subject line "Re: Grad (sic) Coast Loan to Autumn Frost Realty Associates, LLC - $1,500,000.00. In this email, Allen stated "I sent the formation docs for the new entity to Matt."

40.     Your affiant has reviewed a June 15, 2018 email sent by Sargent using the TARGET ACCOUNT to a Grand Coast employee with subject line "RE: Autumn Frost Development," in which Sargent stated "I already sent a statement to Brian Joyce. I have an insurance binder done that is being sent as well. This email was part of a chain wherein a Grand Coast employee requested documents from Sargent, including an updated bank statement.

41.     Your affiant has reviewed a June 15, 2018 email sent by Virginia McLernan, who was a paralegal employed by Allen, to Sargent at the TARGET ACCOUNT containing the subject line "Autumn Frost." In the email, McLernan stated "attached is a draft of the HUD." The HUD-1 attached is unsigned and references $1,300,000 as the contract sales price.  This email was included in a response or attachment sent from Sargent to Grand Coast or Cambridge Trust.

42.     In an interview with law enforcement agents assigned to this investigation, Scarpetti stated that he owned AUTUMN FROST in a partnership with Dennis Demers (Demers), and, prior to selling it, transferred the ownership to his wife (Doris Scarpetti) and Demers' wife (Alana Demers). Scarpetti stated that a realtor contacted him on behalf of Sargent and offered to purchase AUTUMN FROST for $900,000. Scarpetti stated that he never met Sargent, and that John Allen represented Sargent at the closing. Scarpetti stated that Sargent "flipped the land back to himself," on the same day for $1,300,000. Scarpetti stated that he is familiar with this scam, wherein a buyer files two deeds on the same day to deceive the lender.

43.     In an interview with law enforcement agents assigned to this investigation, Demers stated that he and Scarpetti transferred AUTUMN FROST into Alana Demers' name prior to selling it to Sargent. Demers stated that he is also a lender, and that, around the time he was negotiating to sell AUTUMN FROST to Sargent, he received a call from David Fortin (Fortin) who asked if Demers would be interested in splitting a loan for a sale of vacant land in Hookset. Demers stated that Fortin is also a lender. Demers stated that Fortin sent him a P&S for the proposed transaction, and he realized that it referred to AUTUMN FROST. Demers stated that he then realized that Sargent was planning to do two transactions on the same day with AUTUMN FROST, with an inflated price on the second transaction so he could get more money to use on other projects. Demers stated that he attended the closing for AUTUMN FROST in the morning, and that he did not receive the money until the afternoon. Demers stated that the delay was due to the fact that there were two transactions that occurred.

44.     In an interview with law enforcement agents assigned to this investigation, Fortin stated that he is a lender and has completed many transactions with Sargent. Fortin reviewed the P&S referenced above by Demers and stated that he recognized Sargent's signature on the "Buyer" line representing Autumn Frost Realty Associates LLC. Fortin stated that this document refers to AUTUMN FROST, and that Sargent was seeking a loan of $800,000 to acquire the land. Fortin stated that, upon receiving the document, he contacted Demers to ask him if he wanted to lend part of the $800,000 to Sargent. Fortin stated that Demers informed him that he owned the land in question, and that he was selling it to Sargent. Fortin stated that he believed that Sargent was trying to get a loan for more than the purchase price and keep the difference for himself. Fortin stated that Sargent has used Valerie Brochu and "his maintenance man," in the past as straw buyers in real estate transactions involving Fortin.

13

45.     Your affiant has reviewed a HUD-1 provided by Grand Coast pertaining to the AUTUMN FROST transaction. This document is signed by Kenneth Brochu on behalf of "Seller," Autumn Frost Realty Associates LLC.  This document shows the following:

- Contract sales price - $1,300,000

-  Deposit/earnest money paid by the buyer - $25,000

- Holdback (road) - $525,000

- Principal amount of new loan - $1,500,000

- Cash from borrower - $377,860

46.     Your affiant has reviewed bank records showing that Grand Coast sent a wire transfer to the 0196 account (John Allen IOLTA) in the amount of $1,440,000 on June 18, 2018, representing the Grand Coast loan proceeds. On the same date, $1,440,000 was wired from the 0196 account to the 4834 account (John Allen IOLTA). On June 19, 2018, a check cleared the 4834 account for $844,500 to Alana Demers with memo line "Autumn Frost subdivision – sale proceeds." There is no indication of any funding contributed by the Buyer to the transaction as purported in the HUD-1, as it appears the entire transaction (including fees, taxes, road holdback, and funds to seller) was funded by the Grand Coast loan.

*PAUGUS BAY PLAZA CONDOMINIUM*

47.     Paugus Bay Plaza Condominium (PAUGUS BAY) was a commercial property organized as a condominium with twenty-nine units located at 131 Lake Street, Gilford, New Hampshire.

48.     In an interview with law enforcement agents assigned to this investigation, DiVito stated that Sargent requested a loan from Grand Coast to acquire PAUGUS BAY for $3,900,000. DiVito stated that he later learned that Sargent actually acquired PAUGUS BAY for $1,700,000

14

from Steven Cotran and conducted a second transaction involving PAUGUS BAY on the same date for a purchase price of $3,900,000, which was financed by Grand Coast. Your affiant has reviewed public records showing that, on or about October 26, 2018, OGP LLC deeded PAUGUS BAY to Gilford Lake Associates LLC. This deed was signed by Cotran on behalf of OGP LLC. Your affiant has reviewed public records showing that, on or about October 26, 2018, Gilford Lake Associates LLC deeded PAUGUS BAY to Paugus Bay Holdings Company LLC. Brochu signed this deed as Manager of Gilford Lake Associates LLC.

49.     Your affiant has reviewed an October 23, 2018 email from Allen to a Grand Coast employee with carbon copy to Sargent at the TARGET ACCOUNT containing subject line "Re: Title Request 131 Lake St *Est Close 10/31/2018*." In the email, Allen stated "I was not aware he wanted me to resign. I will inquire. I am non-member manager. I have no financial or ownership interest in the property." Allen sent this email in response to a Grand Coast employee's question asking whether the LLC documents would be amended as Allen is the only manager listed on the entity.

50.     Your affiant has reviewed an October 25, 2018 email from Allen to a Grand Coast employee with carbon copy to Sargent at the TARGET ACCOUNT with a document attached titled "Paugus Bay HUD." The attached document is a HUD-1 pertaining to the PAUGUS BAY transaction and shows the contract sales price as $3,925,000.

51.     DiVito stated that PAUGUS BAY was "underwater from the start," and that Sargent submitted leases to Grand Coast showing that PAUGUS BAY was significantly leased, but that in reality, there were few renters. DiVito stated that, on October 23, 2018, he asked Sargent to get Cotran to sign the rent roll as owner of PAUGUS BAY. DiVito stated that Brochu ultimately signed the rent roll representing that he was the owner of PAUGUS BAY. DiVito stated that, after

Sargent fell behind on the loan payments, he went to PAUGUS BAY to speak to the tenants. DiVito stated that he learned that some of the tenants listed on the rent roll provided by Sargent had not been leasing space there for years.

## BACKGROUND CONCERNING E-MAIL

36.     In my training and experience, I have learned that Yahoo provides a variety of on-line services, including email access, to the public.  Yahoo allows subscribers to obtain e-mail accounts at yahoo.com, like the accounts listed in Attachment A.  Subscribers obtain an account by registering with Yahoo.  During the registration process, Yahoo asks subscribers to provide basic personal information.  Therefore, the computers of Yahoo are likely to contain stored electronic communications (including retrieved and un-retrieved emails for Yahoo subscribers) and information concerning subscribers and their use of Yahoo services, such as account access information, e-mail transaction information, and account application information.  In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

37.     In my training and experience, e-mail providers generally ask their subscribers to provide certain personal identifying information when registering for an e-mail account.  Such information can include the subscriber's full name, physical address, telephone numbers and other identifiers, alternative e-mail addresses, and, for paying subscribers, means and source of payment (including any credit or bank account number).  In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.  Based on my training and my experience, I know that, even if subscribers insert false information to conceal their identity, this information often provides clues to their identity, location, or illicit activities.

38.     In my training and experience, e-mail providers typically retain certain transactional information about the creation and use of each account on their systems.   This information can include the date on which the account was created, the length of service, records of log-in (*i.e.*, session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the provider's website), and other log files that reflect usage of the account.   In addition, email providers often have records of the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with particular logins to the account.   Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the e-mail account.

39.     In my training and experience, in some cases, e-mail account users will communicate directly with an email service provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users.   E-mail providers typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.   In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

40.     As explained herein, information stored in connection with an e-mail account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, the

information stored in connection with an e-mail account can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, e-mail communications, contacts lists, and images sent (and the data associated with the foregoing, such as date and time) may indicate who used or controlled the account at a relevant time. Further, information maintained by the e-mail provider can show how and when the account was accessed or used. For example, as described below, e-mail providers typically log the Internet Protocol (IP) addresses from which users access the e-mail account, along with the time and date of that access. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the e-mail account access and use relating to the crime under investigation. This geographic and timeline information may tend to either inculpate or exculpate the account owner. Additionally, information stored at the user's account may further indicate the geographic location of the account user at a particular time (*e.g.*, location information integrated into an image or video sent via e-mail). Last, stored electronic data may provide relevant insight into the e-mail account owner's state of mind as it relates to the offense under investigation. For example, information in the e-mail account may indicate the owner's motive and intent to commit a crime (*e.g.*, communications relating to the crime), or consciousness of guilt (*e.g.*, deleting communications in an effort to conceal them from law enforcement).

## **CONCLUSION**

41.     Based on the foregoing facts, I respectfully submit that there is probable cause to believe that the contents of the TARGET ACCOUNT contain evidence of violations of 18 U.S.C. § 1343 (Wire Fraud), 18 U.S.C. § 1344 (Bank Fraud), and 18 U.S.C. § 1014 (False Statements to a Financial Institution)

42.     Based on the forgoing, I respectfully request that the Court approve the proposed search warrant.  Because the warrant will be served on Yahoo, which will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

Respectfully submitted,

By: /s/ Jeff G. Thompson
Jeff G. Thompson
Special Agent
FDIC – Office of the Inspector General

The affiant appeared before me by telephonic conference on this date pursuant to Fed. R. Crim. P. 4.1 and affirmed under oath the content of this affidavit and application.

Hon. Talesha L. Saint-Marc
United States Magistrate Judge
 Aug 9, 2023

## **ATTACHMENT A**

This warrant applies to information associated with the e-mail account crsargent1989@yahoo.com that is stored at premises owned, maintained, controlled, or operated by Yahoo Inc, ("Yahoo"), a company that is headquartered at 1199 Coleman Avenue, San Jose, California, 95110.

## ATTACHMENT B

### Particular Things to be Seized and

**I.    Information to be disclosed by Yahoo, Inc. (the "Provider")**

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, regardless of whether such information is located within or outside of the United States, and including any e-mails, records, files, logs, or information that has been deleted but is still available to the Provider, or has been preserved pursuant to any previous requests made under 18 U.S.C. § 2703(f), the Provider is required to disclose the following information to the government for each account or identifier listed in Attachment A:

a.    The contents of all e-mails associated with the account dating **from November 1, 2017, to December 31, 2019**, including stored or preserved copies of e-mails sent to and from the account, draft e-mails, the source and destination addresses associated with each e-mail, the date and time at which each e-mail was sent, and the size and length of each e-mail.

b.    The contents of all communications and related transactional records for all Provider services used by the subscriber(s)/user(s) of the e-mail account such as: (i) e-mail services, calendar services, file sharing or storage services, photo sharing or storage services, instant messaging or chat services, voice call services, or remote computing services, including but not limited to incoming, outgoing, and draft e-mails, messages, calls, chats, and other electronic communications; (ii) attachments to communications (including native files); (iii) source and destination addresses and header or routing information for each communication (including originating Internet Protocol ("IP") addresses of e-mails); (iv) the date, size, and length of each communication; and (v) any user or device identifiers linked to each communication (including cookies) ;

c.      The types of service utilized;

d.      Basic subscriber records and login history (including, as described in 18 U.S.C. § 2703(c)(2), names, addresses, records of session times and durations, length of service and types of service utilized, instrument numbers or other subscriber numbers or identities, and payment information) concerning any e-mail account (including both current and historical account) ever linked to the e-mail account by common e-mail addresses (such as a common recovery e-mail address), or a common telephone number, means of payment (*e.g.*, credit card number), registration or login IP addresses (during one-week period), registration or login cookies or similar technologies, or any other unique device or user identifier;

e.      All device or user identifiers which have ever been linked to the e-mail account, including but not limited to all cookies and similar technologies, unique application numbers, hardware models, operating system versions, device serial numbers, Global Unique Identifiers ("GUID"), mobile network information, telephone numbers, Media Access Control ("MAC") addresses, and International Mobile Equipment Identities ("IMEI");

f.      All records or other information stored by an individual using the account, including address books, contact and buddy lists, calendar data, pictures, files, and search histories;

g.      All records pertaining to communications between the Provider and any person regarding the account, including contacts with support services and records of actions taken. The Provider is hereby ordered to disclose the above information to the government within 14 days of the issuance of this warrant.

**II.     Information to be Seized by the Government**

All information described above in Section B(I) that constitutes fruits, contraband, evidence and instrumentalities of violations of 18 U.S.C. § 1343 (Wire Fraud), 18 U.S.C. § 1344 (Bank Fraud), 18 U.S.C. § 1014 (False Statements to a Financial Institution), those violations occurring after September 1, 2017, including, for each account or identifier listed on Attachment A, the following information:

a.     Communications involving real estate transactions and financing by companies controlled by Charles Sargent and John Allen.

b.     Evidence indicating how and when the e-mail account was accessed or used in furtherance of the crimes under investigation, to determine the geographic and chronological context of account access, use, and events relating to the crime under investigation and to the e-mail account owners;

c.     The identity of persons who created or used the e-mail account, including records that help reveal the whereabouts of such persons;

d.     Any deleted e-mails, documents, information, or communications that were created or deleted in furtherance of the crimes under investigation, or any other communications that Yahoo may retain and any records or information associated with efforts to delete those e-mails or communications—including the dates on, and IP addresses from which any efforts to delete were made;

e.     Information that constitutes evidence concerning persons who collaborated, conspired, or assisted (knowingly or unknowingly) the commission of the criminal activity under investigation; and

f.      Information that constitutes evidence indicating the e-mail account user's state of mind, *e.g.*, intent, absence of mistake, or evidence indicating preparation or planning, related to the criminal activity under investigation.

Within 14 DAYS of the issuance of this warrant, PROVIDER shall deliver the information set forth above either via United States mail or courier to Special Agent Jeff G. Thomson, Federal Deposit Insurance Corporation, Office of the Inspector General, 350 Fifth Avenue #1200, New York, NY 10118, or via e-mail to jethomson@FDICoig.gov.